# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00707-COA

**CHARLES L. WELLS A/K/A CHARLES LEE WELLS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                **APPELLEE**

DATE OF JUDGMENT:                     06/13/2022
TRIAL JUDGE:                                   HON. FORREST A. JOHNSON JR.
COURT FROM WHICH APPEALED:   WILKINSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          ROBERT G. WHITACRE JR.
ATTORNEY FOR APPELLEE:             OFFICE OF THE ATTORNEY GENERAL
                                                       BY:  LAUREN GABRIELLE CANTRELL
NATURE OF THE CASE:                    CRIMINAL - FELONY
DISPOSITION:                                  AFFIRMED - 07/16/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Charles Lee Wells appeals his convictions and sentences from the Wilkinson County Circuit Court for the charges of conspiracy to commit murder and first-degree murder. Following trial, the circuit court sentenced Wells to serve twenty years for the conspiracy conviction and life imprisonment for the murder conviction, with the sentences ordered to run concurrently.  After a review of the record, we affirm Wells' convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     A Wilkinson County grand jury indicted Wells, Marcel Smith, and Nathan Lollis each for one count of conspiracy to commit murder and one count of first-degree murder for the death of Carl Newton.  After about four years following the indictment, Wells, Smith, and

Lollis all appeared before the trial court as co-defendants.[1]

¶3. The chain of events leading to Newton's death began on Thanksgiving Day in 2017 when Newton shot Lollis. As a result of the shooting, Newton was originally charged with aggravated assault, but Lollis later agreed to a reduced charge of simple assault. The simple assault charge against Newton was resolved in justice court, and the present case is about Lollis exacting his revenge against Newton.

¶4. In the months between Lollis being shot and Newton being murdered, Lollis contacted Newton's cousin Michael Anderson. Lollis asked Michael if he "wan[ted] to make some money" by "taking Carl Newton out." Michael testified that Lollis was "going around saying I gotta get that m*****f*****. Somebody gotta get him," referring to Newton. Michael initially told Lollis, "[N]o, you better find somebody else to do that." However, Lollis contacted Michael a second time and threatened to kill him or his family if he did not beat up Newton. Michael agreed this time because he was scared for his and his family's safety. Lollis contacted Michael's brother Corey Anderson about the plan as well, and Corey also agreed to "rough him up" for "a couple hundred" dollars from Lollis in return. Michael and Corey decided that they would just "go down there and act like" they were causing bodily harm to Newton.

¶5. Michael testified that Lollis planned Newton's assault to happen at the Shiloh Church

---

[1] Since trial, Smith's and Lollis' convictions and sentences have been affirmed on appeal. *Smith v. State*, 373 So. 3d 586 (Miss. Ct. App. 2023); *Lollis v. State* 373 So. 3d 1004 (Miss. 2023). The issues raised in this case differ from those raised in Smith's and Lollis' appeals. For this reason, we will restate the facts of the case and diverge where necessary for this particular issue.

at Kagler's Bottom in Wilkinson County. On July 16, 2018, the day of Newton's murder, Lollis called and told Michael he wanted him and Corey to "go down there and do what I told y'all to do if y'all knew what good for you." Michael testified that he and Corey walked to Shiloh Church from their grandmother's house. On cross-examination, Michael was challenged on this point with a prior statement he wrote for law enforcement that Lollis had driven him and Corey to the church. But at trial, Michael was adamant that he and Corey walked to the church that night and were not driven.

¶6. On the contrary, Corey initially testified that Lollis picked them up from a store and took them to the church where they were supposed to wait for Newton to arrive. Corey backed off this initial statement on cross, however, and twice admitted that Lollis only picked him up from the store. Corey testified that Michael "got [to the church] on his own" and that he (Corey) did not know how Michael got to the church.

¶7. Once Michael and Corey were at the church, they waited for Newton to arrive. Michael said they waited about an hour or two for Newton to arrive, but Corey said they only waited for "a couple minutes." Both brothers testified that Newton arrived at the church in a truck driven by Smith. Michael testified Smith pulled up to the church driving a "Chevrolet truck or a Ford truck" he thought "was like dark gray." However, Corey testified that Smith pulled up in a "dark, black truck."

¶8. The Anderson brothers testified that the truck had one long seat up front where Smith was sitting in the driver's area, Wells was sitting in the passenger area, and Newton was sitting between them in the middle. Both brothers stated when asked that the truck did not

3

have bucket seats – it was one long seat. Michael testified that the truck was a "[t]wo-door truck" and that "[y]ou actually had to open the door if you wanted to get in the back." Corey explained that "[i]t was a four-door truck" that had "the door then it's got the little half a door that it opens up to" the backseat.

¶9. After the truck arrived, Wells stepped out of the truck, and Michael then pulled Newton out of the truck. Newton fell to the ground, and Michael and Corey hit Newton a few times. Smith and Wells then approached the brothers, and Smith told them that they "wasn't doing it right." So Michael and Corey backed up while Smith and Wells stepped in and began "roughing [Newton] up." Michael and Corey saw Wells pull a gun out of his pocket. Michael specifically testified that he saw Wells pull a black sock out of his pocket, and from inside the sock, Wells pulled out "a chrome plated revolver." Michael and Corey took off running when they saw the gun and heard gunshots as they fled the scene. The next day, Lollis gave Michael and Corey $300 "to keep [their] mouth[s] shut."

¶10. That same morning, local hunters found Newton's body off Sam Leake Road near a hunting camp. This location is approximately seven miles from Shiloh Church. When officers arrived at the scene where Newton's body was found, they observed multiple gunshot wounds to Newton's body. The Mississippi State Medical Examiner's Office performed an autopsy on Newton and determined the manner of his death was homicide due to the "multiple gunshot wounds described as indeterminate range, penetrating gunshot wound of the face, indeterminate range, perforating gunshot wound of the left hand, [and] eight additional gunshot wound defects." The Medical Examiner's Office also recovered

4

three .22-caliber bullets from Newton's body during his autopsy. During investigations after the murder, a chrome .22-caliber revolver was found "in a sock" under a bridge on Highway 61 "not very far . . . about a mile" from Sam Leake Road where Newton's body was found.

¶11. When law enforcement began investigating, they quickly developed persons of interest. First, law enforcement talked to the Anderson brothers, and their statements led law enforcement to Smith. According to Smith, on July 16, 2018, he drove to Natchez in a gray Chevrolet Malibu to attend drug court. On his way back home, Smith got a call from Newton, who asked Smith to pick him up. After Smith picked up Newton from his sister's home where he was living at the time, they went to a store, and Newton bought some beer. Smith said that he and Newton originally were going to his aunt's home to finish a construction job, but Smith's aunt told them not to come over because she was tired. Smith testified that Newton did not want to come home with him, so Newton got out of the car. According to Smith, he then drove back by Newton's sister's home and told Newton's nephew LaSalle Bolden Jr. that Newton would be home later, and Bolden Jr. would need to let Newton in the house. Bolden Jr. testified that Smith was acting "nervous," "fidgety," and "couldn't look [him] in [the] eyes" when he came back that night without Newton. Smith claims that, after that, he then went home for the night.

¶12. The testimony of Johnnie Lee Spears conflicted with Smith's account of the evening. Spears was living at Lollis' house at the time. According to Spears, on the night before Newton was found dead, Smith showed up at Lollis' house driving a pickup truck, and Newton was a passenger in the truck. Smith got out of the truck and knocked on Lollis'

5

door. Spears could hear Smith and Lollis talking as they went inside Lollis' house. Newton remained in the truck. After a few minutes, Smith came out of the house, got back in the truck, and drove off. Spears testified that was the last time he saw Newton alive. Later that night, Smith came back to Lollis' house in a car instead of a pickup truck. Spears did not see Newton. Smith went into the house and talked to Lollis for a while and then left.

¶13. Smith's grandfather Larry Mealy testified that on the day Newton's body was found, he owned a silver GMC Sierra. But Mealy testified that at the time of Newton's murder, the truck was inoperable because the engine was being worked on while the truck sat in Mealy's front yard. According to Mealy, the truck had been inoperable for "[a]bout two weeks" because Mealy had to order the parts for it. Mealy described the truck as a four-door with bucket seats in the front. Mealy acknowledged that his truck could hold three men, but he agreed that the only way three people could fit in the front of the truck was if two of them were sitting with each other in one bucket seat.

¶14. Smith's mother, Melissa Jackson, also testified that Mealy's truck "wasn't working," so Smith was using her 2009 Chevy Malibu for transportation to drug court in July 2018. Smith also testified that "once the truck broke down," he used his mother's Chevy Malibu for transportation. Smith testified he was "[a] hundred and fifty percent positive [he] was driving [his] mother's car" the night Newton was murdered. Smith denied changing vehicles that night and claimed he was driving his mother's car for a "couple days straight."

¶15. Although Smith admitted to picking up Newton from the Bolden home, he denied that he was in a pickup truck despite Bolden Jr.'s testimony that he was driving a truck. When

6

challenged with Michael's testimony that he, Wells, and Newton arrived at the Shiloh Church in a truck, Smith noted that Michael said the truck was "a single cab" and gave the wrong color and model.

¶16.　After trial, the jury found Wells, Smith, and Lollis guilty of the counts of conspiracy to commit murder and first-degree murder. The court sentenced the three of them to serve twenty years for conspiracy and life imprisonment for first-degree murder, with the sentences set to run concurrently in custody of the Mississippi Department of Corrections. The circuit court denied Wells' post-trial motion for a new trial, and Wells appealed.

## STANDARD OF REVIEW

¶17.　"Our role as appellate court is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). This Court "weigh[s] the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id*. (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (¶4) (Miss. 2017)).

## DISCUSSION

¶18.　Wells argues that the verdict of the jury was against the overwhelming weight of the evidence because "Michael and Corey Anderson's testimony [wa]s 'unworthy of belief.'" Wells asserts that the brothers had "completely different accounts of how they arrived at Shiloh Church." Michael testified that he and Corey walked to the church from their grandmother's house. On cross, Michael was challenged on this point with a statement he

7

had written for law enforcement stating that he and Corey were driven to the church by Lollis. But at trial, Michael was adamant that he and Corey walked to the church that night and were not driven. Corey testified that Lollis picked up both him and Michael from a store and took them to the church where they were supposed to wait for Newton to arrive. However, on cross, Corey backed off this initial statement and twice admitted that Lollis picked up only him from the store and that his brother got to the church on his own.

¶19. Wells also mentions the Anderson brothers' testimony regarding the truck that Smith, Wells, and Newton arrived at the church in. Michael and Corey both stated that the truck that Smith, Wells, and Newton were riding in did not have bucket seats but was equipped with "one long seat" in the front. But Smith's grandfather Mealy, the owner of the truck, testified that it was equipped with two bucket seats. Mealy also testified that the truck was inoperable on the date Michael and Corey claimed that Smith was driving it.

¶20. In his brief, Wells argues this Court can reverse and grant a new trial when the "testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief," citing *Brown v. State* 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000). This case also states that jurors are the finders of fact and "are charged to listen to the evidence, observe the demeanor of the witnesses, and decide the issue of the credibility of the witnesses and what weight to give to any particular piece of evidence." *Id*.

¶21. The Mississippi Supreme Court has held, "When evidence or testimony conflicts, the jury is the sole judge of witness credibility and the weight and worth of their testimony."

8

*Bernard v. State*, 288 So. 3d 301, 306 (¶19) (Miss. 2019). With that power comes "the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory[,] and sincerity." *Moore v. State*, 773 So. 2d 984, 986-87 (¶8) (Miss. Ct. App. 2000). When "there is substantial evidence consistent with the verdict, evidence which is of such weight and quality that, keeping the burden of proof of beyond a reasonable doubt in mind, fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the jury's verdict[s] should be allowed to stand." *Caston v. State*, 148 So. 3d 680, 683 (¶13) (Miss. Ct. App. 2014) (quoting *Sheffield v. State*, 749 So. 2d 123, 127 (¶15) (Miss. 1999)).

¶22. In this instance, the jury heard testimony from the Anderson brothers four years after Newton's death. Although their testimony was inconsistent on how they arrived at the church, the jury heard enough testimony from each of the brothers to determine the credibility of the testimony and what weight to give it. The jury also heard conflicts in the evidence regarding the details of the truck itself and if the truck the Anderson brothers testified to seeing Smith, Wells, and Newton in was even operable at the time of Newton's murder. However, two additional witnesses testified that they had seen Smith driving the truck that night. Both Bolden Jr. and Spears testified that they had seen Smith driving a pickup truck the night before Newton's body was found. Wells does not challenge either of these testimonies identifying the truck.

¶23. Further, even though there were inconsistencies in how they arrived at the church and in the descriptions of the truck, both of the Anderson brothers testified with certainty that

9

Wells was in the vehicle driven by Smith when it arrived at the church. This testimony of both brothers was consistent throughout trial. They also both consistently testified that they saw Wells pull out a gun and, as they fled the scene, they heard gunshots. Michael went as far as specifically testifying that he had seen Wells pull out a black sock from his pocket, and from the sock, Wells pulled out a "chrome plated revolver," which was consistent with the description of the gun officers found in a sock only about a mile from where Newton's body was found. The Anderson brothers had some inconsistencies in their testimony of how they arrived at the church and the description of the church, but one thing that they were sure of the entire time was that they both saw Wells pull out a gun. When Wells pulled out the gun, they fled the scene and then heard gunshots. This was the last time either of them saw Newton alive. Wells' defense counsel even pointed out during closing arguments that "[t]he only thing that was consistent that [Michael and Corey] said [was] that Mr. Charles Lee Wells . . . was the shooter."

¶24. As this Court and the Mississippi Supreme Court have repeatedly held, it is the jury's job to be the sole judge of witness credibility and the weight and worth of the testimony. Even when testimonies are inconsistent, the jurors are responsible for determining the impeachment value. Here, the jurors acted within the bounds of their duties when hearing the Anderson brothers' testimonies and reaching the verdict. Therefore, we do not find that the jury's verdict finding Wells guilty of the crimes was against the overwhelming weight of the evidence.

**CONCLUSION**

10

¶25. After reviewing the record, we find that the jury had enough evidence to weigh the credibility of the testimony and reach their verdict. Upholding this verdict would not sanction an unconscionable injustice. Thus, we affirm Wells' convictions and sentences.

¶26. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**